## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAINT JOSEPH HEALTH SYSTEM, INC.   )
d/b/a SAINT JOSEPH – LONDON   )
1001 Saint Joseph Drive   )
London, KY 40741   )
   )
     Plaintiff,   )
   )
     v.   )   Case No. _____
   )
UNITED STATES DEPARTMENT   )
OF HEALTH AND HUMAN SERVICES   )
200 Independence Avenue, S.W.   )
Washington, D.C. 20201   )
   )
     Defendant.   )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF'S APPLICATION FOR
## <u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

Pursuant to Fed. R. Civ. P. 65, Plaintiff Saint Joseph Health System, Inc. d/b/a Saint

Joseph – London ("SJL"), through its undersigned counsel, submits this Memorandum of Points

and Authorities in Support of Plaintiff's Application for Temporary Restraining Order ("TRO")

and Preliminary Injunction.

### <u>INTRODUCTION</u>

Just before the close of business on Friday, September 6, 2014, the United States

Department of Health and Human Services ("HHS") informed SJL of its decision to publicly

release commercially-sensitive information disclosed to it during settlement discussions it had

with SJL.  It intends to disclose the documents on September 10, 2014 and has refused to extend

that self-imposed deadline.

While SJL does not object to HHS's proposed production of approximately 70 pages of documents, it does object to the approximately 30 pages in dispute (the "Disputed Documents") which contain SJL commercial and proprietary data.[1]  SJL seeks to prevent this disclosure, and filed this action after its attempts to obtain an extension of the September 10 deadline were rejected.

The communications at issue arose in the context of settlement discussions SJL had with the Department of Justice ("DOJ"), HHS's Office of Inspector General ("OIG"), and the Commonwealth of Kentucky regarding cardiology procedures performed at SJL.  Both because of the settlement context of the communications and their significant competitive value to SJL's competitors, the documents are protected from disclosure.  This Court should therefore enjoin HHS from publicly releasing them.

## STATEMENT OF FACTS

HHS plans to release the information at issue tomorrow in response to a request made months ago under the Freedom of Information Act ("FOIA") by The Poppe Law Firm ("Law Firm").  Verified Complaint at ¶¶ 19, 26.  The Law Firm has filed more than 200 malpractice suits against SJL related to certain cardiac procedures at issue in SJL's settlement with the government.  *Id.* at ¶ 20.  Its objective is to make an impermissible end run around the discovery process in these 200 cases.[2]  *Id.*  As set forth more fully below, the Disputed Documents are protected by FOIA Exemption 4, 5 U.S.C. § 552(b)(4), and the Trade Secrets Act, 18 U.S.C. § 1905.  Additionally, the release or disclosure of the information would result in immediate and

---

[1] SJL will provide a complete set of the Disputed Documents to this Court for *in camera* review.

[2] SJL has withheld the Disputed Documents from production in the underlying litigation.

irreparable competitive harm to SJL and have a "chilling effect" on parties engaging in settlement negotiations with government agencies.  Conversely, there will be no harm to the government from protecting the information at issue by not releasing it to the public or to FOIA requestors, including the Law Firm.  Accordingly, immediate injunctive relief is warranted.

SJL operates a 120-bed regional hospital located in London, Kentucky, and provides a variety of health care services to patients in multiple counties in southeastern Kentucky. Verified Complaint at ¶ 10.  Following self-reporting by SJL in March of 2011, the DOJ began an investigation of SJL and certain non-employed physicians practicing at SJL related to the clinical appropriateness of interventional cardiology procedures ("Cardiac Procedures") performed on Medicaid and Medicare beneficiaries at SJL.  *Id.* at ¶ 11.

Before that investigation, SJL had voluntarily provided information to the DOJ regarding the SJL's concerns with Cardiac Procedures performed at SJL by one particular physician. *Id.* at ¶ 12.  SJL subsequently learned that certain whistleblowers had filed a lawsuit under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 – 3733, which named SJL and others as defendants.  *Id.* at ¶ 13.

On January 22, 2014, following its extensive investigation the DOJ, OIG, and the Commonwealth of Kentucky entered into a settlement agreement ("Settlement Agreement") regarding Cardiac Procedures in which SJL agreed to pay $16,500,000 in return for a release of potential liability under the FCA and other laws.  *Id.* at ¶ 14.

The parties to the Settlement Agreement expressly stated and agreed that nothing contained in it or related to it would be deemed an admission of liability by SJL.  *Id.* at ¶ 15.  In connection with the Settlement Agreement, SJL also agreed with the DOJ and the OIG that it would simultaneously enter into a Corporate Integrity Agreement ("CIA") with the OIG in return

for the OIG releasing its permissive exclusion authority under federal health care programs. *Id.* at ¶ 16.  A CIA is a complex, lengthy document, which requires a health care provider, such as SJL, to invest substantial time, effort, and expense, and implement specified policies, procedures, and processes, related to the provider's compliance program and adherence to federal statutes and regulations. *Id.* at ¶ 17.

Following negotiations between SJL and the OIG spanning several months regarding the specific language and obligations to be included in the CIA, SJL and the OIG reached an agreement and executed the CIA on January 22, 2014. *Id.* at ¶ 18.

On April 15, 2014, the Law Firm submitted a FOIA request [5 U.S.C. § 552 *et seq.*] to the OIG seeking any documents in the OIG's possession regarding SJL's CIA, including "those that led up to [its] entry including negotiations, draft submissions, and other documents." *Id.* at ¶ 9; *see also* Exhibit C to Verified Complaint.

On June 5, 2014, the OIG notified SJL that it had received the Law Firm's FOIA's request. The OIG provided SJL with 174 pages of information it had located in response to the FOIA request.  The OIG asked that SJL review those documents to see if any of the materials found by the OIG should be redacted or withheld from production, based on one of the nine applicable exemptions under the FOIA. *Id.* at ¶ 21.  No further action was taken by OIG after June 9 until just over one week ago. *Id.* at ¶ 23.

On June 9, 2014, after obtaining a brief extension of time to respond to the OIG's June 5th letter, SJL submitted its initial response and objections to the OIG.  SJL requested that OIG redact or withhold a number of the documents located during its search pursuant to 5 U.S.C. § 552(b)(3) ("Exemption 3"),  5 U.S.C. § 552(b)(4) ("Exemption 4"), or 5 U.S.C. § 552(b)(7)

("Exemption 7"). *Id.* at ¶ 22.  As requested by the OIG, SJL noted the specific pages it believed should be subject to redaction or withheld altogether. *Id.*

On September 2, 2014, the OIG provided SJL with its notice of intent to release certain documents in response to the Law Firm's FOIA request (the "September 2 Decision"). *Id.* at ¶ 23.  While the OIG agreed with SJL regarding some of the objections SJL raised in its June 9th letter, the OIG stated that it still intended to produce a number of documents that SJL requested be withheld from production. *Id.*  The OIG indicated that it would produce the Disputed Documents five (5) business days later on September 9, 2014. *Id.*

On September 4, 2014, SJL provided the OIG with a supplemental response and objections, which addressed the Disputed Documents. *Id.* at ¶ 25.  In its letter, SJL specifically asked that OIG withhold the Disputed Documents from production under the FOIA because they meet the requirements of Exemption 4. *Id.*  SJL explained that:

    a.  Because the Disputed Documents included correspondence regarding settlement negotiations between SJL and the OIG, those communications were of substantial importance to SJL's business operations, decision making, and long-term strategy. Accordingly they are "commercial" as that term has been defined by numerous courts interpreting Exemption 4.

    b.  Contrary to the assertions in the OIG's June 5, 2014, letter to SJL that the records received by the Office of Counsel for the Inspector General under the CIA were "required" submissions, in reality, a substantial volume of the Disputed Documents were provided to the OIG voluntarily, and not pursuant to the valid exercise of any statutory or regulatory mandate, policy, or other authority. Further, information in the Disputed Documents was not of the type SJL would customarily make available to the public. Even if the Disputed Documents were not provided to the OIG "voluntarily," the disclosure of the Disputed Documents would cause substantial harm to SJL's competitive position. Based on these factors the Disputed Documents were "confidential" as defined by FOIA Exemption 4.

     c.  Because the Disputed Documents included settlement conversations between the OIG and SJL, in light of the Federal Rules of Evidence, and related precedent, the information was "privileged" as that term is used by FOIA Exemption 4.

*Id.*

On September 5, 2014, in response to SJL's supplemental objections, the OIG agreed to make some additional redactions to the Disputed Documents. *Id.* at ¶ 26.  Nonetheless, much of the privileged and/or confidential commercial or financial information remained unredacted and OIG made it clear that it will produce this unredacted information to the Law Firm. *Id.*  The date of production was extended by only one day, to September 10, 2014 (the "September 5 Decision"). *Id.*  The September 2 and September 5 Decisions constitute final agency action within the meaning of 5 U.S.C. § 704, reviewable by this Court pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.*

The Disputed Documents are primarily comprised of negotiation correspondence between outside counsel for SJL, counsel for the OIG, and attorneys from the DOJ regarding the terms of the CIA.  Verified Complaint at ¶ 24.   The Disputed Documents contain crucial commercial information regarding SJL's provision of and assessments of healthcare services in its geographic region.  *See* Declaration of Greg Gerard ("Declaration") attached as Exhibit A hereto at ¶ 3.

More importantly, SJL has consistently maintained the confidentiality of the Disputed Documents, which contain information that is confidential, proprietary, and privileged commercial and financial information within the meaning of FOIA.  *See* Declaration at ¶ 4.  Moreover, all relevant times, SJL has considered the information at issue to be trade secrets within the meaning of the Trade Secrets Act, 18 U.S.C. § 1905.  *Id.*  Both because of the confidential commercial information in the Disputed Documents and because a fair reading of

the FOIA request does not support their production, SJL's application for immediate injunctive relief should be granted.

## ARGUMENT

### I.    Legal Standard

A plaintiff seeking a temporary restraining order or preliminary injunction must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Sherley v. Sebelius,* 644 F.3d 388, 392 (D.C. Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008)); *see also Lofton v. District of Columbia*, 2013 WL 6710352, *2 (D.D.C. Dec. 20, 2013) ("In determining whether to issue a temporary restraining order, the Court must apply the same standard that is applied to preliminary injunctions.") (citations omitted).  Furthermore, the District of Columbia Circuit has applied a "sliding scale" approach in evaluating the temporary restraining order/preliminary injunction factors. *Sherley,* 644 F.3d at 392. Accordingly:

> [i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor. For example, if the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success ... Alternatively, if substantial harm to the nonmovant is very high and the showing of irreparable harm to the movant very low, the movant must demonstrate a much greater likelihood of success. It is in this sense that all four factors must be balanced against each other.

*Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291–92 (D.C.Cir. 2009) (internal quotation marks and citations omitted).

Here, the record easily establishes each of these four factors and, in fact, makes "an unusually strong showing" as to each.  As discussed below, there is a significant likelihood that SJL will succeed on the merits of its claim as the information at issue clearly is confidential and

privileged commercial and financial information within the meaning of FOIA Exemption 4 and the Trade Secrets Act. There also can be no real dispute that HHS's release of the information at issue would result in immediate and irreparable harm to SJL because it would publicly reveal SJL's valuable strategic plans and decision-making processes, thereby placing SJL at an immediate competitive disadvantage. *See* Declaration at ¶¶ 3-7.

Furthermore, no harm to the government will result from protecting the information at issue by not releasing it to the public or to FOIA requestors, including the Law Firm; any such harm can only occur if HHS is permitted to release SJL's confidential and privileged information to a law firm that is seeking to manipulate FOIA purely to gain an advantage in litigation, as an end-run around the discovery process and the trial judge. The balance of equities, therefore, weighs in favor of protecting SJL's confidential and privileged information.

Finally, protecting against the release of the information at issue will serve the public interest by encouraging parties who have disputes with the government or who are in litigation against the government to freely engage in settlement negotiations with the government, thereby promoting the efficient resolution of such disputes and litigation. Should HHS not be enjoined from releasing the information at issue, the result would be a "chilling effect" on parties' settlement negotiations with the Government, including the willingness of parties to engage in these negotiations. The public interest is further served by ensuring that government agencies comply with the law and applicable regulations. Allowing plaintiffs' law firms unfiltered access to settlement discussions will only undermine the strong public interest in promoting settlements.

## II.   SJL Is Likely To Succeed On The Merits Of The Case.

SJL alleges that HHS is not authorized by FOIA to release the information at issue. SJL further alleges that HHS is prohibited by the Trade Secrets Act, 18 U.S.C. § 1905, to release this

information.  Therefore, SJL alleges that HHS's September 2 and September 5 Decisions exceed

HHS's statutory jurisdiction or authority, and are consequently, arbitrary, capricious, an abuse of

discretion or otherwise not in accordance with law.

The Disputed Documents contain confidential business information that, if revealed,

would aid SJL's competitors in initiating litigation or regulatory challenges, which would result

in those competitors preventing SJL from providing certain medical services, and driving current

or future patients from SJL to competing medical facilities in the service area and beyond.  *See*

Declaration at ¶¶ 3-7.  Should HHS produce the Disputed Documents, the court will be deprived

altogether of the opportunity to decide the merits.

SJL's communications with the government, which obviously were of substantial

importance to SJL's business operations, decision making, and long-term strategy, are exempted

from FOIA's disclosure authorizations and are prohibited from release by the Trade Secrets Act.

Additionally, the portion of the Law Firm's FOIA request under which the settlement discussions

are sought is vague and grossly overbroad.  This portion seeks "any other documents" that "led

up to" the CIA.  Allowing HHS even to provide a partial response to this request subjects it to

the argument that it must provide every responsive document from SJL that pre-dated the entry

of the CIA.  For example, it could be argued that all billing records for each one of the Cardiac

Procedures led up to the CIA.  That portion of the FOIA request should be stricken as overbroad.

Taken together, SJL has demonstrated a strong likelihood that it will succeed on the

merits.

**A.**   **FOIA Exempts SJL's Confidential And Privileged Information From Release.**

All of the information at issue is clearly within the province of Exemption (b)(4) to the

FOIA.  Exemption (b)(4) states that the FOIA's requirement for the release of information does

not apply to "trade secrets and commercial or financial information obtained from a person and

privileged or confidential." 5 U.S.C. § 552(b)(4).  Thus, the relevant two-part inquiry is whether

the information in question is (a) "commercial or financial information" and (b) "privileged or

confidential."

      1.      **The information SJL seeks to protect is "commercial" or "financial" information.**

The D.C. Circuit has broadly defined "commercial information" as information in which

the submitter has a "commercial interest." *Public Citizen Health Research Group v. FDA*, 704

F.2d 1280, 1290 (D.C. Cir. 1983).  In doing so, the Court specifically rejected the government's

effort in *Public Citizen Health* to limit the term to records that reveal basic commercial

operations.  *Id.*  The courts have further recognized that categories of information covered under

the rubric of "commercial information" include business sales statistics, research data, technical

designs, customer and supplier lists, profit and loss data, overhead and operating costs, and

information on financial conditions.  *Landfair v. U.S. Dept. of the Army*, 645 F. Supp. 325, 327

(D.D.C. 1986).  The Disputed Documents satisfy that standard.

      2.      **The information SJL seeks to protect is "privileged or confidential" even if it were submitted involuntarily.**

The second question is whether the information is "privileged or confidential" under

FOIA Exemption 4.  To answer the question, courts typically apply one of two tests, depending

on whether the information in issue (a) was submitted voluntarily or (b) was information that the

person was required to submit to the government, *i.e.*, submitted under compulsion.  If the

information was submitted voluntarily, the information will be deemed confidential if "it is of a

kind that would customarily not be released to the public by the person from whom it was

obtained."  *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879

(D.C. Cir. 1992). If the information was a *required* submission, it will be deemed confidential if its disclosure would either (a) impair the government's ability to obtain necessary information in the future or (b) cause substantial harm to the competitive position of the person who submitted the information. *National Parks and Conservation Assoc. v. Morton*, 498 F.2d 765 (D.C. Cir. 1974); *see also Critical Mass*, 975 F.2d at 878.

Under either test, the information at issue here is unequivocally "privileged or confidential" under Exemption 4. A substantial volume of the Disputed Documents was provided to the OIG voluntarily, and not pursuant to the valid exercise of any statutory or regulatory mandate, policy, or other authority. *See* Declaration at ¶ 3. The information in the Disputed Documents obviously is not of the type SJL would customarily make available to the public. *Id.* at ¶ 4. SJL's settlement and business strategies represent SJL's work product and proprietary thinking. *Id.* at ¶¶ 3-7 There is simply no reason for SJL to share this information with the public. In fact, SJL has every reason to avoid disclosing this information to the public, among who are its industry rivals. *Id.* Moreover, the disclosure was made solely as a means to reach an agreement on a CIA and voluntary settlement, conduct which should be encouraged as a matter of public policy and federal law. *See, e.g.,* Fed. R. Evid. 408.

Even if the Disputed Documents were not provided to the OIG "voluntarily," the disclosure of the Disputed Documents clearly would cause substantial harm to SJL's competitive position. *See* Declaration at ¶¶ 3, 6-7. This Court's decision in *Honeywell Info. Sys., Inc. v. NASA,* 1976 WL 181137 (D.D.C. 1976), illustrates the point. In *Honeywell*, this Court held that it was improper, under FOIA Exemption (b)(4), for NASA to release information that would "apprise competitors of the innovative approaches, combination of devices and software, and

choices of equipment utilized by Honeywell [to complete a government contract], to its competitive disadvantage in similar future procurements." *Id.* at *3.

Here, the excerpts proposed for redaction contain information regarding SJL's proprietary innovations and strategic approach to serving its health care constituency. Releasing this information would allow SJL's competitors to peer into SJL's proprietary decisional process. *See* Declaration at ¶ 7. For this reason, the courts have recognized that releasing such information could result in substantial harm to the competitive position of the party submitting information to the government. For example, in *National Parks & Conservation Ass'n v. Kleepe*, 547 F.2d 673 (D.C. Cir. 1976), the D.C. Circuit considered whether information would be useful to a competitor in devising means to improve its competitive position at the expense of the business whose information was being released. The Court determined that "the likelihood of substantial harm to [the submitter's] competitive position [is] virtually axiomatic [where] [d]isclosure would provide competitors with valuable insights into the operational strengths and weaknesses of [the submitter], while the [competitors] could continue in the customary manner of 'playing their cards close to their chest.'" *Id.* at 684. In other words, it would be fundamentally unfair for SJL's competitors to obtain SJL's proprietary and confidential business strategies and approaches, if SJL cannot share the reciprocal benefit of access to its competitors' proprietary and confidential information. Here, the release of the information identified by SJL clearly reaches the level of detail and specificity of the kinds of information for which release has been held to constitute this harm.

Furthermore, there can be no doubt that the release of information and communications involving a party's settlement negotiations with the government would impair the government's ability to obtain necessary information to facilitate future settlements and resolutions of disputes.

12

More than this, this Court has expressly held that such settlement communications are within the
exemption for trade secrets and commercial or financial information obtained from a person and
privileged or confidential.  *See M/A-Com Info. Sys., Inc. v. U.S. Dep't of Health & Human
Servs.*, 656 F. Supp. 691 (D.D.C. 1986).  For this reason as well, the information is confidential
for purposes of FOIA.

Accordingly, under the Exemption 4 test for confidential and privileged commercial and
financial information, the identified information should not be released by HHS.

> **B.**     **The Release Of SJL's Information Is Also Prohibited By The Trade Secrets
> Act.**

In addition to the bar of Exemption 4, the Trade Secrets Act prohibits the unauthorized
disclosure of "practically any commercial or financial data collected by any federal employee
from any source." 18 U.S.C. § 1905.  The courts have determined that the Trade Secrets Act
"independently prohibits the disclosure of confidential information." *Mallinckrodt Inc. v. West*,
140 F. Supp. 2d 1, 4 (D.D.C. 2000).  *See also CNA Financial Corp. v. Donovan*, 830 F.2d 1132,
1151 (D.C. Cir. 1987), *cert. denied*, 485 U.S. 977, 108 S. Ct. 1270, 99 L.Ed.2d 481 (1988)
(stating that the Trade Secrets Act is co-extensive with Exemption (b)(4) of FOIA); *Martin
Marietta Corp. v. Dalton*, 974 F. Supp. 37, 38 (D.D.C. 1997) (stating that the Trade Secrets Act
"prohibits the government's discretionary disclosure of information in its possession 'not
[otherwise] authorized by law,' i.e., FOIA." (emphasis added)).

Therefore, the Trade Secrets Act is an independent bar to HHS's release of the
information at issue and SJL has overwhelmingly demonstrated that it is likely to succeed on the
merits of its instant action against the government.

### C.     The Request For Pre-CIA Documents Is Overbroad.

The portion of the Law Firm's FOIA request under which the settlement communications

contained in the Disputed Documents are sought is impermissibly overbroad and should not be

responded to by HHS in the first instance.  This portion seeks "any other documents" that "led up

to" the CIA.  *See* Exhibit C to Verified Complaint.  Courts routinely hold that agencies do not

have to comply - or otherwise are simply unable to comply - with requests of such an overbroad

and vague nature because they fail to reasonably describe the records sought and require an

unreasonably burdensome search.  *See James Madison Project v. CIA*, 2009 WL 2777961, * 3

(E.D. Va. Aug. 31, 2009) (concluding that a non-profit organization's FOIA request that the CIA

provide documents pertaining to "[t]he indexing and organizational structure of all CIA Systems

of Records subject to FOIA" was overbroad and would place an unreasonable burden on the

CIA, and thus was denied); *see also, e.g., Am. Fed. of Gov't Employees, Local 2782 v. U.S. Dep't

of Commerce,* 907 F.2d 203, 209 (D.C.Cir.1990) ("An agency need not honor a request that

requires an unreasonably burdensome search.")).

HHS's attempt to comply with such an overbroad request only serves to further

demonstrate that HHS's September 2 and 5 Decisions are arbitrary, capricious, an abuse of

discretion or otherwise not in accordance with law, and that SJL is likely to succeed on the

merits here.

### III.    SJL Will Suffer Irreparable Harm If The Information Is Released To The Public And HHS Will Suffer None, Thus The Balance Of Equities Weighs Heavily In SJL's Favor.

#### A.     SJL Will Suffer Irreparable Harm As Soon As The Disputed Documents Are Released.

As previously established, HHS's release of the information at issue would result in

immediate and irreparable harm to SJL.  *See* Declaration at ¶¶ 6-8.   It would publicly reveal

SJL's valuable strategic plans and decision-making processes, thereby placing SJL at an immediate competitive disadvantage. *Id.* In addition, absent an injunction, SJL's ability to appeal HHS's adverse decision will be eviscerated, with no opportunity to recapture the information lost prior to a hearing on the merits of HHS's September 5 Decision.

### B.     HHS Will Not Suffer From A Delay In The Production.

Conversely, there will be no harm whatsoever to HHS from protecting the information at issue by not releasing it to the public or to FOIA requestors, including the Law Firm.  Any such harm has been brought about by HHS's wrongful decision to release SJL's confidential and privileged information to a law firm that would be unable to obtain through the discovery process.  Additionally, HHS waited close to two (2) months before it even notified SJL that it had received the FOIA request, and then close to three (3) more months after SJL responded before issuing its September 2 and September 5 Decisions.  No harm to HHS will result in allowing additional time for a proper, orderly resolution of this dispute on its merits.  The balance of equities, therefore, firmly weighs in favor of protecting SJL's confidential and privileged information.

### IV.     The Public Interest Will Be Served By The Issuance Of Injunctive Relief.

An immediate injunction is in the public interest.  As recognized by the D.C. Circuit Court of Appeals, the disclosure of confidential information of parties that deal with federal agencies may "impair the Government's ability to obtain necessary information in the future." *National Parks*, 498 F.2d at 770.  This strong public policy is further encapsulated by the provision in the Trade Secrets Act making it a criminal offense for an agency to disclose a party's trade secrets and data.  Therefore, it is in the public interest to ensure that improper disclosures of confidential and privileged information are not made by the government.  This

interest is not served by permitting HHS to disregard or otherwise misapply federal statutes but, rather, can only be properly served by maintaining the status quo until this case can be decided on its merits.

Additionally, protecting against the release of the information at issue will serve the public interest by encouraging parties who have disputes with the government or who are in litigation against the government to freely engage in settlement negotiations with the government, thereby promoting the efficient resolution of such disputes and litigation. Should HHS not be enjoined from releasing the information at issue, preliminarily or otherwise, the result would be a "chilling effect" on parties' settlement negotiations with the government, including the willingness of parties to engage in these negotiations. In this regard, under very similar circumstances, this Court has stated:

> Moreover, *it is in the public interest to encourage settlement negotiations in matters of this kind and it would impair the ability of HHS to carry out its governmental duties if disclosure of this kind of material under FOIA were required.* Thus, while the commercial interest may be slight, it should be protected under the exemption.

*M/A-Com Info. Sys., Inc.*, 656 F. Supp. at 692-93 (emphasis added).

Ultimately, SJL has established each of the four factors necessary to establish its entitlement to a TRO and preliminary injunctive relief.

## CONCLUSION

HHS will effectively prevail on the merits without an injunction. Should the production on Wednesday proceed as planned, SJL will have no means of putting the proverbial genie back in the bottle. The damage will be done. Accordingly, SJL respectfully requests that this Court enjoin HHS from disclosing the information at issue by issuing a temporary restraining order and preliminary injunction until this matter can be resolved on its merits.

SJL has demonstrated that the balance of hardships and public interest weigh heavily in favor of injunctive relief because of the immediate and irreparable harm that it will suffer if HHS publicly releases the information at issue.  Combined with the strong showing that SJL has made that it is likely to prevail on the merits of the case, immediate injunctive relief is warranted.

Dated:   September 9, 2014                     Respectfully submitted,

_____

George E. Kostel (DC Bar No. 1000015)

_____

Emil Hirsch  (DC Bar No. 930479)

_____

Steven A. Pozefsky (DC Bar No. 477349)
**POLSINELLI**
1401 Eye Street NW, Suite 800
Washington, D.C. 20005
Telephone:  (202) 783-3300
Facsimile: (202) 783-3535
Email:  gkostel@polsinelli.com
ehirsch@polsinelli.com
spozefsky@polsinelli.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAINT JOSEPH HEALTH SYSTEM, INC.  )
d/b/a SAINT JOSEPH – LONDON  )
1001 Saint Joseph Drive  )
London, KY 40741  )
  )
      Plaintiff,  )
  )
    v.  )    Case No. _____
  )
UNITED STATES DEPARTMENT  )
OF HEALTH AND HUMAN SERVICES  )
200 Independence Avenue, S.W.  )
Washington, D.C. 20201  )
  )
      Defendant.  )
_____)

### DECLARATION OF GREG D. GERARD

I, Greg D. Gerard, being duly sworn, declare and say, under penalty of perjury, that the following statements are true and correct to the best of my knowledge:

1.    I am over 18 years of age, competent to make this Declaration, and do so based on my first-hand knowledge of the facts it contains.

2.    I am the President of Saint Joseph Health System Inc., d/b/a Saint Joseph - London ("SJL"), the Plaintiff in this action, located at 1001 Saint Joseph Drive, London, KY 40741.

3.    While negotiating with the United States Department of Health and Human Services ("HHS"), SJL submitted certain proprietary information to HHS in a manner that indicated that its information was being provided voluntarily. The proprietary information concerns certain business decisions about SJL's current and future strategic healthcare specialties and the market for those specialties in Kentucky (the "Commercial Information"). The

Pamco Printers NYC #488

A

48775339.1

Commercial Information is contained in documents reflecting HHS's Office at Inspector General ("OIG") Bates numbers "OCIG-000086 to OCIG-000087 and OCIG-000088 to OCIG-000174." SJL does not object to the production of the remainder of the documents which OIG has provided for its review.

4.      SJL makes every effort to keep this type of strategic information confidential.  On April 15, 2014, a request for SJL's communications about and reports to HHS made in connection with a "Corporate Integrity Agreement" ("CIA") was issued by a Kentucky law firm, The Poppe Law Firm, which has brought over 200 lawsuits against SJL.

5.      SJL has not produced the Commercial Information at issue here, to The Poppe Law Firm in the course of discovery, for any lawsuits brought against SJL.

6.      If the HHS releases the requested information, SJL's competitive position in the healthcare market in Kentucky would be irreparably harmed.  Its competitors could use the Commercial Information to their advantage and the detriment of SJL.  Further, SJL would certainly be reluctant to negotiate freely and openly with regulatory officials if necessary in the future out of concern that its strategic and other commercial information would be readily and openly disclosed pursuant to the FOIA.

7.      Disclosure of the Commercial Information would allow a competitor to peer into SJL's management decision making, business operations, and long-term strategic plan.  For example, a competitor could use the information to initiate litigation, or regulatory challenges which would result in those competitors preventing SJL from providing certain medical services, and driving current or future patients from SJL to competing medical facilities, in the service area and beyond.

2

8.      If the Commercial Information is disclosed, the injury caused to SJL, could not be compensated by money damages and would be irreparable to their commercial advantage.


I declare, under penalty of perjury, that the information given above is true and correct, to the best of knowledge.

Dated: _____        _____

Greg D. Gerard, President
Saint Joseph Health System, Inc.,
d/b/a Saint Joseph - London

3